FOIL, Judge.
This case involves a partition of the community property which existed between plaintiff, Honorine Russo Guarisco, and defendant, Luke L. Guarisco.
Mr. and Mrs. Guarisco were married on March 9, 1968. On June 23, 1982, Mrs. Guarisco filed suit against her husband seeking a separation from bed and board. On September 22, 1983, Mr. Guarisco brought suit seeking a divorce based on living separate and apart for one year. The two suits were consolidated, and the parties were divorced on December 9,1983, thereby terminating the community of ac-quets and gains previously existing between Mr. and Mrs. Guarisco as of September 22, 1983.
After their divorce, Mrs. Guarisco instituted this proceeding to partition the former community. Three disputes were presented to the trial court for its decision:
(1) her claim for reimbursement for community property used to improve the family residence, which is his separate property;
*1127 (2) his claim for reimbursement for separate property expended on behalf of the community; and
(3) her claim for reimbursement for one-half of the enhanced value of 200 shares of corporate stock in Oil & Gas Rental Services, Inc., which is his separate property.
After trial on November 1 and 11,1985, the trial court entered written reasons on the issues presented to it. Thereafter, a final judgment was signed by the trial court encompassing its reasons for judgment. The court made the following findings with respect to the spouses’s claims:
(1) the community is entitled to reimbursement of $400,423.09 for improvements made to his separate residence;
(2) he is entitled to reimbursement of $611,553.00 for the expenditure of his separate funds on behalf of the community; and
(3) she is not entitled to reimbursement for the enhanced value of defendant’s separate stock in Oil & Gas Rental Services, Inc.
Mrs. Guarisco was granted this appeal from the trial court’s judgment and raises the following issues:
(1) whether the law applicable to her enhancement claim is La.Civ.Code Art. 2368, as enacted by Act 709 of 1979, effective January 1,1980, or its repealed predecessor, Art. 2408 of the La.Civ.Code of 1870;
(2) whether she bears the burden of proving that the increase in value of the separate property was not due solely to natural causes; and
(3) whether the trial court erred in granting his claim for reimbursement for the payment of community debts with his separate property.
The trial court was correct in applying La.Civ.Code Art. 2368, since the right to claim reimbursement for enhancement of the value of separate property becomes available upon dissolution of the community and not before. Here, the spouses are bound by the law in effect at the termination of the community rather than by the law at the time of their marriage. That this was the intent of the Legislature in enacting Act 709 of 1979 is evidenced by Section 10 of the same. It provides that spouses living under the prior legal community property regime could adopt a matrimonial regime of their choice by matrimonial agreement executed before January 1, 1980. There is no evidence of record to indicate that the Guariscos executed such an agreement. Thus, on the effective date of Act 709, January 1, 1980, the rights and obligations of the spouses in this case were henceforth governed by the provisions of the Act.
The trial court was also correct in holding appellant bears the burden of proof under Article 2368. Moreover, the record supports the trial court’s finding that plaintiff failed in her burden of proof and therefore was not entitled to a credit for the enhanced value of defendant’s corporate stock.
With respect to Mr. Guarisco’s reimbursement claim, this Court will not disturb the factual findings of the trial court because “[TJhere is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding ...” Canter v. Koehring Company, 283 So.2d 716 (La.1973).
After a thorough review and evaluation of the record, we are convinced the evidence supports the reasons assigned by the trial court, and we affirm, adopting its reasons as our own, and attach a copy hereto. All costs are to be paid by Hono-rine Russo Guarisco.
AFFIRMED.
APPENDIX
16th Judicial District Court Parish of St. Mary State of Louisiana
Honorine Russo Guarisco v. Luke L. Guarisco
Number 72,596-F
REASONS FOR JUDGMENT
Honorine Russo Guarisco (Honorine) filed this, suit to partition the community *1128 estate formerly existing between herself and Luke L. Guarisco (Luke), and for settlement of reimbursement claims between the parties.
The parties were married on March 9, 1968. On June 23, 1982 Honorine filed suit seeking a judicial separation (Docket No. 67,104). On September 22, 1983 Luke filed suit in this Court seeking an absolute divorce based on living separate and apart one year (Docket No. 70,911). These actions were consolidated, and on December 9,1983 a Judgment of Divorce was granted in Luke’s favor. It was stipulated that Honorine was free from fault in the original cause of the separation. The community of acquets and gains formerly existing between the parties was therefore terminated on September 22, 1983, as provided by Louisiana Civil Code Article 159.
The parties have submitted sworn detailed descriptive lists, have filed traversals, and evidence and testimony has been presented to the Court. The parties are in agreement with respect to the liabilities and assets of the former community in all but three areas, specifically:
1. a reimbursement claim of $400,423.09 for improvements made to Luke’s separate residence allegedly with community funds;
2. a reimbursement claim of $211,129.91 for Luke’s separate funds allegedly expended on behalf of the community; and
3. an enhancement claim by Honorine for one-half the increase in value of Luke’s separately owned stock in Oil & Gas Services, Inc.
THE REIMBURSEMENT CLAIMS
The parties established their matrimonial residence in a house owned separately by Luke. Between January 1, 1968 and October 1977, improvements were made to the home which cost a total of $400,423.09. During this same period, various loans to-talling $462,185.04 were made to the community.
Honorine contends that the funds expended for the improvements to Luke’s separate property were community funds, and she is therefore entitled to be reimbursed one-half the value of the funds. Luke contends that he does not owe a reimbursement to the community because the improvements were ultimately paid for with his separate funds.
On February 19, 1980 Luke sold 15,000 shares of his undisputed, separate stock for $611,553.56. The following day $443,-847.84 was paid to three banks to retire three loans. On March 20, 1980 a Mercedes automobile was purchased with funds from this account, and on April 15, 1980 $127,589.00 was paid from this account to the Internal Revenue Service for taxes. The Mercedes has been treated by both parties as community property, and Federal Taxes incurred during the community are presumed to be community obligations. Total funds expended on these items amounted to $616,032.80.
The law is clear that a spouse owes reimbursement to the community when community funds have been expended to improve that spouse’s separate property. Louisiana Civil Code Article 2366. Succession of Sonnier, 208 So.2d 562 ([La.App.] 3rd Cir.1968); Richard v. Richard, 383 So.2d 806 ([La.App.] 1st Cir.1980). There is also a presumption that obligations incurred during the marriage are community obligations. Louisiana Civil Code Article 2361. Therefore, the loans made to the community are presumed to be community obligations, and the proceeds are community funds. The Court is satisfied that the improvements made to Luke’s separate property were paid for with community funds, in large part with the proceeds of the loans made to the community from April 1976 through July 1977. He must, therefore, reimburse the community for the improvements.
The evidence and testimony presented at trial showed that the proceeds from the sale of Luke’s stock were used to retire community debts, purchase a car for the community, and pay community taxes. Luke is entitled to be reimbursed for satisfying these community obligations, and enhancing the community, with separate
*1129 property. Louisiana Civil Code Articles 2365, 2367; Gachez v. Gachez, 451 So.2d 608 ([La.App.] 5th Cir.1984), writ denied 456 So.2d 166; Gilley v. Ketchens, 478 So.2d 638 ([La.App.] 2nd Cir.1985). Although Articles 2365 and 2367 did not become law until January 1,1980, the Gachez Court applied them in that case. In Gachez, supra, a reimbursement claim resulted from the termination of a marriage contracted in 1975 and terminated in 1981. The reimbursement was due for a down payment on the family home made January 4, 1980.
THE ENHANCEMENT CLAIM
In November of 1967, four months prior to his marriage to Honorine, Luke acquired stock in the newly incorporated Oil & Gas Rental Services, Inc. (the Company). At that time the Company had a capital base of $100,000.00. The value of the Company increased to several million dollars by 1983. Luke was closely connected with the Company throughout the parties’ marriage, as president and later as Chairman of the Board and took an active part in its day to day operations. On September 22, 1983, the date the community terminated, Luke owned 23.5 percent of the Company’s stock.
Honorine contends that Luke’s labor and industry during their marriage (equivalent to common labor or industry, Abraham v. Abraham, [230 La. 78], 87 So.2d 735 (La.1956)) resulted in the dramatic increase in value of the Company. She argues that Louisiana Civil Code Article 2408 (repealed), which was the governing law during most of the marriage, should be applied, entitling her to one-half the increased value of Luke’s separate stock. Article 2408 reads:
“When the separate property of either the husband or the wife has been increased or improved during the marriage, the other spouse, or his or her heirs, shall be entitled to the reward of one half of the value of the increase or ameliorations, if it be proved that the increase or ameliorations be the result of the common labor, expenses or industry; but there shall be no reward due, if it be proved that the increase is due only to the ordinary course of things, to the rise in the value of property, or to the chances of trade.”
Luke contends that Louisiana Civil Code Article 2368 which replaced Article 2408 effective January 1,1980, should be applied to the facts presented in this matter. Article 2368 provides:
“If the separate property of a spouse has increased in value as a result of the uncompensated common labor or industry of the spouses, the other spouse is entitled to be reimbursed from the spouse whose property has increased in value one-half of the increase attributed to the common labor.”
Luke argues that because he was compensated for his work with the Company, Ho-norine is not entitled to be awarded any portion of his stock’s enhanced value.
The initial determination to be made is whether former Article 2408 or current Article 2368 applies to Honorine’s enhancement claim. It is well established that as a general rule, a law can prescribe only for the future, Louisiana Civil Code Article 8; Tullier v. Tullier, 464 So.2d 278 (La.1985), and cannot be applied retroactively so as to impair obligations or divest or impair vested rights. Tullier, supra. However, laws which are procedural or remedial in nature are generally not viewed as impairing vested rights, and are applied retroactively in the absence of specific language to the contrary. Ardoin v. Hartford Accident & Indemnity Co., 360 So.2d 1331 (La.1978); Tullier, supra.
Honorine argues that her right to “reward” under former Article 2408 vested prior to January 1, 1980 because the marriage was contracted and the majority of the community’s duration existed while Article 2408 was law. The Court must disagree.
Under Article 2408 a claimant for reimbursement was required to show:
“First. What was the condition of the property at the time of the marriage? Second. What would be the value of such property at the dissolution of the *1130 community, in the state in which it was at the time of the marriage? Third. What was the real value of the said property, with all the improvements existing thereon, in the condition in which it was at the time of the dissolution of the community? Fourth. What is the difference between the two estimates? Deliberto v. Deliverto, [Deliberto ], 400 So.2d 1096, 1099 (La.App. 1st Cir.1981), citing Babin v. Nolan, 6 Rob. 508, 514 (1844).
(Emphasis added.) McKey v. McKey, 449 So.2d 564 ([La.App.] 1st Cir.1984). Clearly, the right to reimbursement is contingent upon the existence of enhanced separate property at the dissolution of the marriage, and the claimant spouse can have no interest in a mere expectation. That an interest does not vest until the dissolution of the marriage is now reflected in Louisiana Civil Code Article 2358 which provides:
“Upon termination of a community property regime, a spouse may have against the other spouse a claim for reimbursement in accordance with the following provisions [including Art. 2368].”
In discussing the new Matrimonial Regimes Law, two members of the Advisory Committee to the Joint Legislative Subcommittee Revising Louisiana’s Community Property Laws, wrote that the right to reimbursement is “specifically available only upon termination of the regime.” Spaht and Samuel, Equal Management Revisited: 1979 Legislative Modifications of the 1978 Matrimonial Regimes Law, 40 La.L.Rev. 83, 143 n. 367 (1979). In light of the foregoing, the Court must apply Louisiana Civil Code Article 2368 to this case, where the community terminated after the effective date of this article.
Article 2368 provides for reimbursement of one-half of any increased value of separate property where the increase is “a result of the uncompensated common labor or industry of the spouses ...”. At first blush, it would appear that under the facts of this case Honorine would not be entitled to reimbursement because Luke was compensated (by some standards one might say quite handsomely) for his labor and industry on behalf of the Company. However, the Comment to Article 2368 states, in part:
“Under this provision, when separate property has increased in value due to the uncompensated labor and industry of either spouse, the other spouse is entitled to one-half of the increase. To the extent that a spouse is compensated for his labor, no reimbursement is due. (Emphasis added.)
This comment indicates that no reimbursement is due only to the extent that a spouse is compensated. Labor exceeding the spouse’s compensation which results in increased value of separate property, would still entitle the claimant spouse to reimbursement for enhancement resulting from the uncompensated labor.
As applied to the matter at hand, Hono-rine is entitled to reimbursement if she can satisfy the test outlined in McKey, supra, as to any labor or industry beyond which Luke was compensated, and must show that the enhancement was not due to natural enhancement. McKey, supra.
The Court notes that the test set out in McKey is clearly couched in language dealing with improvements made directly to or on real property, not enhancement of the value of incorporeals such as stock. Nevertheless, these rules are easily applied by analogy. Honorine is therefore first required to show the value of Luke’s stock at the time of the parties’ marriage. She must then show what the value of that stock would have been at the dissolution of the marriage had Luke not contributed uncompensated community labor or industry to the Company. Third, she must show the real value of Luke’s stock at the dissolution of the marriage. The difference in the latter two determinations establishes the enhanced value of the separate property. Finally, Honorine must establish that the enhancement claimed was not due to the natural course of events. The burden to show all of the above is on the claimant spouse. McKey, supra.
After extended and exhaustive examination of the testimony and evidence presented in this case, the Court finds that Hono-rine has failed to carry that burden of *1131 proof. While the initial value of Luke’s stock was clearly established at $35,000 and several measures of the value of Luke’s interest in the Company were presented, Honorine failed to establish what the value of Luke’s interest would have been had the community not provided uncompensated labor or industry. Hono-rine also failed to show that the enhanced value was not due to natural enhancement. In fact, the Court is conversely persuaded that the great increase in the stock’s value was due primarily to the vagaries of the oil industry during the period in question. The Court was especially impressed by the graphic representations of the economic evidence presented during trial which were supplied to the Court by defendant’s attorneys. (Attached as Appendix I.) These graphs clearly illustrate the correlation between economic conditions, the revenue of the Company, and Luke’s compensation.
Further, the Court is persuaded that the community was fully compensated for Luke’s labor and industry, by virtue of his annual salary and bonus of $381,500. Evidence was submitted that Internal Revenue Service seriously questioned the compensation Luke received but he was able to justify those amounts.
The Court therefore finds that Honorine is not entitled to reimbursement for the increased value of Luke’s separate stock in Oil & Gas Rentals, Inc.
PARTITION OF THE COMMUNITY
The parties to this litigation submitted sworn detailed descriptive lists of community assets and liabilities which differed only as to the claims outlined above. Having decided those issues, we must now partition the community property as directed by La.R.S. 9:2801.
La.R.S. 9:2801(1) requires the parties to list all liabilities and assets of the community. A review of the descriptive lists submitted, considering the Court’s findings in the disputed areas, reveals that the community possessed assets as of trial of $803,-164.89 and liabilities in the amount of $1,221,477.63. (See Appendix II attached) Conspicuously absent from the lists of assets presented to the Court are the normally expected items of community property, such as household furnishings, appliances, utensils, sporting equipment, and other miscellaneous movables. Nevertheless, the Court must accept the descriptive lists as presented.
The Court awards all listed assets to Luke, with the exception of $25,000 cash which is allocated to Honorine. Luke is to assume and pay all outstanding community obligations, except $234,156.37 of the $611,-553 owed him by the community. Hono-rine is to satisfy this portion of the liabilities by giving Luke her promissory note in the principal sum of $234,156.37, payable in 180 monthly installments of $1,300.87 each, without interest.
This rather unusual partition requires some explanation. For all but about three years of the fifteen years of the parties’ marriage, Luke was the head and master of the community. The settled law of this State for more than 180 years was that the husband had the unfettered control and management of the community assets and likewise could incur community obligations without any restraint or restriction whatever. His improvidence in the use of this raw power subjected him to a penalty, only at the termination of the community, if the community was insolvent at that time. The nonmianagerial spouse walked away from those debts free and clear and the head and master was saddled with them. The constitutionality of the head and master concept was seriously attacked in 1979 and was legislatively repealed effective in 1980. See La.Civil Code Article 2404 (repealed) and Winter v. Gani, 199 So. 600 ([La.App.] 1st Cir.1941) and Smith v. Viser, 117 So.2d 673 ([La.App.] 2nd Cir.1960) and citations therein.
One element has characterized much of this litigation from Honorine’s point of view. The timing of the changes in the law have wreaked pure havoc with her estate. Admittedly, especially beginning with the enactment of the new laws in 1980, she might have demanded more of a voice in the management of the community and if need be, had other weapons at her control *1132 up to and including the termination of the community. The requirement in the foregoing reasons that Luke assume the community obligations and that he be reimbursed therefor by Honorine with a long term non-interest bearing promissory note, is an effort by the Court to soften to the greatest extent possible, what is considered to be an unfair, if not down right inequitable, but nevertheless, a proper legal result under the present community partition law.
The parties are to submit to the Court by mail any mathematical errors noted in the calculations involved in this partition within ten days of the date below.
Judgment in keeping with these reasons will be signed upon presentation after ten days. All costs are to be paid by Luke.
THUS DONE AND SIGNED in Chambers at Franklin, Parish of St. Mary, Louisiana, this 30th day of July, 1986.
/s/ M.J. McNulty
APPENDIX I
TABLE OF CONTENTS
Title Exhibit A-l Luke L. Guarisco Annual Compensation (bonuses included)
Title From Oil & Gas Rental Service, Inc. 1968 thru 1985
Exhibit A-2 Officers’ Compensation Oil and Gas Rental Service, Inc. For the eighteen years ended October 81, 1985
Exhibit A-3 (two parts) Part I: Annual Income History Oil & Gas Rental Service, Inc. All Operations Inception thru 10/31/85
Part II: Annual Income History Oil & Gas Rental Service, Inc. Rental Tool Division Inception thru 10/31/85
Exhibit A-4 Average Number of Rigs Running in the United States from 1967 thru 1985 Oil & Gas Journal, May 19, 1986, pp. 19-26.
Exhibit A-5 Consumer Price Index for All Items and for Fuel Oil & Coal
Exhibit B Standard & Poor’s Index of Oil Service-Equipment Companies From 1967 thru 1985 Excerpt from Standard & Poor’s Stock Price Indexes, regarding “Description of Method Used in “Computation”
Exhibit C Comparison of Oil and Gas Marine Division Earnings against 10% Return on Investment in Cargo Vessels
Exhibit D Luke L. Guarisco Annual Compensation (in 1982 dollars) Compared to Executive Compensation for Comparable Size Business
*1133 [[Image here]]
*1134 [[Image here]]
*1135 [[Image here]]
*1136 [[Image here]]
*1137 [[Image here]]
*1138 [[Image here]]
*1139 [[Image here]]
[[Image here]]
■ lunging oil prices have pushed the U.S. rig count to its lowest level since World War II.
Fearing continued low prices, oil and gas operators have slashed upstream spending. The cutbacks in turn have decimated the U.S. rig fleet.
An oil price drop of more than 50% since late last year, the biggest ever, spawned a record drop in the rig count — almost 1,400 units from Dec. 20, 1985, to May 12, 1986.
The rig count fell to 809 units, compared with the postwar peak of 4,530 at yearend 1981. Oil & Cas Journal's most recent assessment calls for average active rigs this year of 1,012, down 49% from 1985. This assumes stabilization of crude prices at $15/bbl.
Drilling activity is off sharply in Europe as well. Offshore rigs have been idled or stacked in record numbers worldwide.
Mar19.IM6.0il£Gas Journal 19
The price outlook offers mostly uncertainy. There are a few signs that the bottom in oil prices has been reached. The slump in crude futures prices in the U.S. and Europe has halted. On the other hand, there is evidence that the price war will persist as Saudi Arabia discounts its netback prices. It began netback pricing last fall, when it *1140 increased its production by 2 million b/d in an already weak market.
[[Image here]]
Industry generally agree that the bottom in prices should be reached this year, perhaps during the summer. Projections call for a range of $12-15/bbl, but some warn of a drop to less than $ 10/bbl in the weeks ahead.
U.S. producers are continuing to shut in oil production in response to the soft oil market. Although most shut-ins currently are uneconomic, some profitable wells are being curtailed pending a price increase. Although impossible to measure, the amount of crude oil in the market is falling. Thai, coupled with a demand increase, could firm the market enough to increase prospects for another production-restraining agreement among members of the Organization of Petroleum Exporting Countries and, others.
Such an accord could firm oil prices further and trigger a turnaround in the petroleum market later this year or early next year. Some industry forecasts anticipate $18-20/bbl oil prices by yearend.
An oil price of $20/bbl this year might be due only to seasonal factors and therefore be temporary. When oil prices are at SI 5/bbl, coal has trouble competing with fuel oil, while much U.S. and other non-OPEC oil remains uneconomic. Thus, even with a production agreement, prices could stabilize at an average of SI 5/bbl during 1986-87 and track inflation thereafter.
So companies are hedging their bets by pegging investment to their near term expectations for prices. During the first quarter, most companies severely cut capital and exploratory spending’, especially in the U.S.
falling rig count lower levels of conventional reserves replacement in the years ahead And reduced capital spending in response to $15/bbl oil will cripple some of the major high cost offshore frontier and enhanced oil recovery projects that are seen as the U.S.'s best chances to replace reserves. So U.S. dependence on oil imports is expected to rise by 1990 from recent levels of about 30% of total supply.
Plunges in oil prices and the rig tally underscore the petroleum industry's worst collapse ever. The pace and extent of company moves, from shutting down exploration to shedding assets, in response to expectations of continued tow oil prices, suggest extreme pessimism in some quarters (OGJ. May 12, p. 41).
The gloomy outlook is spurring calls from some industry officials for Washington, D.C., to step in to bail out U.S. operators with an oil import fee. Some also are calling on the government to ease regulatory and fiscal burdens for relief.
But the most likely relief will come only with an end to overproduction, especially by the Saudis. The decimation of the petroleum industry at a SI 5/bbl oil price, especially in the U.S., could relinquish back to Saudi Arabia more of the market share it yielded when prices were twice that level or more.
How much production gets shut in during the months ahead may determine whether the uptick in oil and gas prices happens in 1986 or in the 1990s.
Rig tally collapse. The May 12 Hughes Tool Co. rotary rig count was the lowest since April 1943, when the tally hit 805.
At 809, it was five rigs less than the previous postwar low of 814 rigs on Mar. 15, 1971. It also was 57.4% less than its level at same time a year ago. Lowest count on record is 692 in March 1942. Hughes started keeping the tally in January 1940.
2* CNIZCkKmiuI,MwI9. 1996
*1141 [[Image here]]
The Hughes count of active rigs late in 1980 topped by one the previous postwar record high of 3,137 on the strength of price spikes in (he 1970s (OG|, Oct. 6, 1980, p. 44). The tally continued to climb until it peaked at 4,530 on Dec. 28, 1981, a few months after the first signs of softness in oil prices. It’s been mostly dropping since then.
On Dec. 23, 1985, the rig count reached a peak for the year of 1,995. The tally dropped 97 the next week, recovered by 17 the first week of 1986, and declined steeply after that.
The rig count traditionally tracks crude prices. But there are other factors in the slide, including uncertainty over federal tax reform proposals. Operators fear that statutory depletion for independents and current year ex-pensing of intangible drilling costs may be threatened or that their taxes may be increased in other ways.
And a byproduct of recent merger activity is higher than normal debt loads for some companies, which consequently have less money to spend on exploration and development.
Further evidence of the rig count slump continuing in 1986 can be seen in the level of oil and gas drilling permits. First quarter permit filings dropped to 8,916 from 19,116 from first quarter 1985, according to Petroleum Information Corp.
The deep cuts in exploration spending also surfaced in the number¿x)f new field wildcat permits, down almost 40% to 1,771 last quarter from 1985's first quarter. Outpost well permits dropped about 36% to 2,903, and development well permits dropped about 30% to 15,252..
IADC expectations. Ed McGhee, executive vice-president. International Association of Drilling Contractors (IADC), expects the rig count to bottom in midsummer. The rate of decrease, he says, is moderating.
"These rig count figures are quantifying the economic devastation among drilling contractors and suppliers. We will do well to get an 1,100 this year."
The upshot is that by 1987, U.S. contractors may lose the ability to field more than about 1,800 rigs. But the short term loss of drilling capability can be offset with a large infusion of cash, as industry proved in 1980.
Because drilling activity changes lag oil price changes, the rig count may not reflect an upturn in prices for as long as 6 months, McGhee says.
He believes long term improvement will come from gas well drilling. That could occur in second quarter 1987, provided that a more normal winter spurs U.S. gas demand.
EIA projections. Ted Anderson, petroleum engineer in the U.S. Energy Information Administration's Dallas field office, predicts the rig count will bottom the second week in November at 696. And the yearend surge will bring it back only to 815.
Anderson thinks that current trends will result in an average for 1986 of 925 rigs. That level of drilling would yield as few as 37,000 wells and 160 million ft of hole, the lowest since 1975.
EIA projects a continuing decline to 782 this week, 755 by May 26, and 734 by the end of June. From then, the count will decline about 2 rigs/ week until November. If projections hold true, only one remaining count in 1986, Dec. 26, will 800.
Due to recent tax law changes, Anderson says, "The portion of the well drilled after Jan. 1 can no longer be charged back to the previous year. So the big, high (yearend) kick we've grown accustomed to since World War II is no longer with us."
are based on continued gains in rig efficiency.
"If the count averages 925, and if efficiency improves again as it has since 1981, the average active rig will drill 172,500 ft this year. That translates to a 160 million ft total, and at last year's average well depth (4,312 ft), to 37,000 wells."
The totals are about half of 1985's. Offshore drilling slumps. Pennzoil Co. Pres. Richard J. Howe expects the international offshore rig' count to drop by 200 rigs this year to about 400 and remain there through at least 1990.
In the U.S., the offshore drilling collapse could leave a lot of current leases untouched by the bit.
In the Gulf of Mexico alone there are about 1,800 undrilled leases acquired since 1982 for $5.6 billion with terms that expire by 1990, says William J. Johnson, president of Standard Oil Production Co. He expects many leases to be relinquished un-drilled.
Hugh J. Kelly, Ocean Drilling & Exploration Co. president, put the total number of undrilled Gulf of Mexico leases at about 2,300.
There currently are 76 rigs active in the Gulf of Mexico out of 244 available. That’s a record high number of idle rigs. In April, the tally of idle Gulf rigs topped 100 for the first time. In January 1985, there were 226 rigs active out of a 250 unit fleet. That, represented the historic high number of rigs active in the Gulf of Mexico, mostly resulting from the advent of area-wide sales in 1983.
MaylS. 1966. Oils Gar kuna! 21
*1142 The number of rigs working off Northwest Europe also is falling.
Last month, 31 units in the North Sea were idle, compared with nine at the beginning of the year.
At the same time, rig availability increased to 117 from 113. The number of wells drilled in the period fell to 69 in April from 94 in fanuary.
' The biggest drop came in the U.K. sector, where the number of active rigs fell to 37 in April from 54 at the beginning of the year.
In the Dutch sector, the rig count fell to 16 from 18, and in the Norwegian sector the tally dropped to 12 from 16 in the same period.
Drilling costs. Until recently, the effects of oil price declines on drilling economics were at least partly offset by falling drilling costs. But that trend may be ending.
ElA's Anderson finds no elasticity left in competitive bids and doubts the continuing slump will further depress drilling costs.
"Drilling costs, for the same type of drilling, have dropped as low as they can go."
But operators still can save drilling expenditures through application of new technology.
He cites Atlantic Richfield Co.'s experience on Alaska's North Slope. The company began 1985 running 11 rigs. After adding top drive, measurement while drilling, and polycrystalline diamond bits, the program was cut to four rigs, with greater output of wells and footage.
Average well costs may not have dropped, but the drilling budget did.
Vello Kuuskraa, Lewin & Associates, sees an overhang of depressed drilling costs for the next 2 years and thinks they could drop further in the near term.
The major reduction in drilling costs hasn't worked its way through company economics, he contends.
Drilling costs "are going to drop further even if it means contractors are going to write off equipment. Otherwise, they'll go out of business."
That will happen even with a price rebound, he acids, "because the companies need the cash for other things."
Futures prices. The futures market, especially the New York Mercantile Exchange (Nymex), has served as a moment-by-moment window on crude oil prices during this year's collapse.
At $15/bbl, Nymex crude futures prices are down about 52% from the highest closing price in late November.
The futures price of West Texas intermediate closed on Nov. 20 at $31.72/bb!. A 3 day late November holiday interrupted trading in the U.S., and the Nymex price closed $2.66/bbl lower on the first trading day in December.
The Saudis announced their intention to abandon their role as swing producer and press for a larger market share, and the price began its historic slide. ,
During December through March, the price traded as low as about $9.50/bbl. The low closing price was $10.42/bbl on Mar. 28.
Several factors have nudged prices up since then. Among them are burgeoning U.S. gasoline demand, higher fuel oil demand in the U.S.S.R. owing to nuclear plant shutdowns, and another escalation in the Iran-lraq war (OGI, May 12, Newsletter).
On May 9 Nymex contracts for June delivery of WTI closed at about $15.86/bbl. the highest since the Feb. 17 close of $16.01. last week WTI futures prices settled at about $15.77/ bbl.
Europe: freefall overt In Europe the continued rise in crude oil prices has generated speculation that the freefall is over.
Prices for Brent blend, the most widely traded of North Sea crudes and the marker for Northwest European prices, were heading up despite a slight falter early in the week.
Brent for May delivery dipped briefly below $14/bbl but recovered to $14.60/bbl. The London market is looking at $13.65/bbl for July delivery.
The upswing has led to speculation in London that the price could be on the way to $18-2Q/bbl by yearend.
But more-cautious market sources contend that view represents a triumph of hope over experience and that the recovery could be short-lived, with fourth quarter prices no more than $ 15-17/bbl.
However, there is general agreement in the London markets that the price will remain relatively firm throughout May. That outlook stems mostly from a tight stock position resulting from refiners' reluctance to rebuild inventories in a falling market.
Strong demand for gasoline, particularly in the U.S., also helped build confidence in the markets.
OPEC oil production has risen to 18 million bAi this month. While current stock building can support the increased OPEC output without putting pressure on prices, some market sources are apprehensive about what will happen when refiners return to normal purchasing patterns.
Industry officials also noted that two other Middle East producers, Oman and the United Arab Emirates, have cut their contract prices retroactively for April by as much as $1.25/bbl.
The latest price cuts will trim Abu Dhabi's price for- Durban crude to $11.30/bbl from $12.50/bbl and Oman's price to $10.90/bbl from $11.85/bbl.
This follows Saudi Arabia's decision to offer discounts ranging from 50c/ bbl to SI.25/bbl in addition to net-back formulas for May deliveries. Some of the larger customers for Saudi netback crude are reported to be unhappy with the size of the discounts.
Non-OPEC accommodation? Also boosting the longer term .market outlook are signs of compliance with OPEC demands that nonmembers rein production.
The Kuwait Times quoted a senior Chinese official as saying that China will freeze oil exports at the 1985 level of 600,000 b/d to help OPEC stabilize the world oil market.
The change of government in Norway has produced a more conciliatory attitude toward cooperation with OPEC.
There also have been reports that Egypt is preparing to reduce its oil production in a bid to help OPEC reach agreement on production levels at its meeting in Yugoslavia next month.
In addition, there is generally a .more optimistic view of the outcome of the Yugoslavian meeting, although cautious market sources say there still isn't enough firm evidence to support this contention.
Ame Oien, Norway's new oil minister, says that if OPEC could hammer out a production formula to stabilize the market, Norway would consider making a contribution toward maintaining stability.
He says it isn't against Norwegian interests to adjust production levels if this helps to ensure that new offshore development could take place.
The Ministry of Oil and Energy says Norway will not take the initiative on reducing production but is prepared to talk to OPEC once it has reached agreement on production.
The situation in Egypt is confused. Stories of production cuts to help OPEC started circulating after Kuwaiti Oil Minister Ali Khalifah al-Sabah spent 2 days in Cairo talking with President Hasni Mubarak and Oil Minister Abdulhadi Kandil.
However, industry sources say Egyptian production can't be cut much further.
OPEC officials, who previously were gliximy alrout prospects for drawing the organization together to settle oul|Hil quotas, now say that the atmosphere within the organization is starting to improve.
JZOilAGjtiounul.MsyIS. 190S
*1143 [[Image here]]
While price hawks Algeria, Iran, and Libya show no signs of moderating support for deep production cuts to immediately boost prices, it appears they are becoming more isolated from the mainstream of OPEC thinking.
It's too early to be overconfident about the June 25 meeting, says one OPEC official, but it seems that things are starting to move in the right direction.
Price forecasts. Oil price forecasts by analyst; and industry officials cover a wide range. Here's a sampling:
• Pace Consultants, Houston: Oil prices will remain at $12-14/bbl through the third quarter but increase slightly during the fourth quarter and into 1987. An OPEC accord and non-OPEC cooperation could push prices past S15/bbl.
Pace says oil prices stabilized during the last 2 months because they've reached a level where residual fuel backs out natural gas and coal.
• Lodwrick Cook, ARCO chairman: With a production accord.among OPEC and some non-OPEC producers possible by the end of summer, a rebound to $18-20/bbl is likely shortly thereafter.
• John K. McKinley, Texaco Inc. chairman: The highest probability is that by yearend crude prices will be at about $16/bbl. Texaco sees about a 40% chance that prices might rise to $17-22/bbl and less than a 10% chance that they will fall below $10/ bbl.
• George M. Keller, Chevron Corp. chairman: The odds are better than 50-50 for a production accord and price rebound to about $20/bbl by yearend.
• T. Boone Pickens Jr., general partner of Mesa Limited Partnership: Oil prices wilt rebound to $20/bbl by Oct. 1 and no later than Jan. 1. He cites non-OPEC output declines stemming from the Saudi price war and' growing gasoline demand among factors underlying his optimism that the market has bottomed and begun recover.
"With gasoline demand coming up again, you might see a funny snap" to resurgent oil demand, Pickens says. "There's a one in three chance that we'll have $20/bbl by July."
• Merrill Lynch: Aside from regular spot market price spikes, prices will average SI 5-16/bbi through 1987.
• Underwood Neuhaus & Co. Inc., Houston: Even with the temporary bottoming at $12-13/bbl, the continuing surplus could weaken oil prices further this summer to test the recent trading day low of $9.75/bbl. Inventory restocking, higher demand, and production quotas could push prices to $15-18/bbi later in the year. During the next 2-3 years, there will be a seasonal price range from S13/bbl in die summer to $18/bbl in the winter.
• Canadian Energy Research Institute: Genera! agreement over crude prices bottoming at $11-14/bbl through the second quarter will be accompanied by rapid restocking and thus a spike of 1-1.5 million b/d in oil demand, spurring a third quarter recovery.
Well shut-ins. U.S. operators continue to shut in marginally economic wells.
Mesa Limited Partnership plans to curtail about 20% of crude output beginning June 1 until prices rise significantly from the current WTI postings of about $14/bbl.
Mesa's working interest share of total production from wells it operates is about 4,500 b/d. That puts its shut-in volume at about 1,000 b/d of oil, mostly involving deep wells in giant Hugoton field of Kansas and Oklahoma.
Phillips Petroleum Co. has idled 621 grots wells in the U.S. and Canada. That cut the company’s production by 2,600 b/d with about half the curtailment in Burbank field in Osage County, Okla.
Burbank field is in an advanced stage of maturity. Waterflooding began in the 1950s. and enhanced oil recovery, mainly polymer augmented waterflooding, has been in progress in parts of the North and South Burbank units.
Phillips is operator and owns about 60% of the working interest in the North and South' Burbank units.
The company has idled 318 producing wells and about 200 injection wells in the two units since Apr. 23 in response to low oil prices. Posted prices for Burbank crude had declined to about $12/bbl.
Before the wells were shut in, production from the units was 3,300 b/d of oil and more than 300,000 b/d of water. Oil production was expected to drop to 1,760 b/d but has been averaging slightly more than that.
, Phillips isn't at risk of losing leases. The properties are unitized so any production on any lease in the unit holds all leases in the unit. Phillips anticipates no ill effects on the Pennsylvanian Bartlesville sand reservoir.
An official says the company would have to expect oil prices to climb and remain at a higher level for more than a few months before it will restart the wells. He declines to estimate what oil price is needed.
The shut-ins at Burbank eliminated 56 jobs, says Charles Kittrell, Phillips executive vice-president.
Texaco U.S.A. Inc. has shut in about 2,600 wells that had been producing an estimated 28,000 b/d of oil, says James W. Kinnear, vice-chairman.
Most of the wells are California heavy oil producers, but wells in other areas of the U.S. also have been shut in, Kinnear says.
Oklahoma independents, asking expedited, lower electric rates, also have shut in wells, according to a survey by Oklahoma Independent Petroleum Association (OIPA).
OIPA says independents have shut in 445 wells temporarily or permanently since Jan. 1 because electric costs have made the wells uneconomic with prices falling. Production loss is 1,246-b/d of oil. Producers say they will shut in due to power costs another 1,042 wells, entailing 3,663 b/d of oil output, if the crude price falls to $10/bbl.
California shut-ins. California oil wells, dominated by high cost heavy oil production and thermal enhanced oil recovery, have been hit hard by the oil price slide.
Moreover, California producers, especially independents, must contend with competition from Alaska North Slope (ANSI crude and the federal government's production from Elk Hills Naval Petroleum Reserve. Competition from OPEC and Mexico has narrowed the differential between Gulf Coast and West Coast prices in recent months.
M Oil&GkMay 1», tSS6
That spurred ANS producers to land *1144 as much as 700,000-800,000 b/d of oil in addition to the usual West Coast ANS demand for about 900,000 b/d, industry officials estimate.
Also, independents contend that Elk Hills oil, among the state's highest quality crude, is selling for as much as -$4.40/bbl below current crude postings for comparable grades. That pushes another 80,000 b/d of oil into the market.
California Independent Producers Association (CIPA) estimates that California operators have shut in 7,500-10,000 wells. That represents, on the high side, as much as 50,000 h/d of oil output, says CIPA executive director Stephen 8erg-Hansen.
On the other hand, production from a number of big steamflood projects will come on stream this year. The new output could offset much of the shut-in production.
But California operators are losing some reserves.
Xtra Energy Co. shut in 45 wells (elated to C02 flood in giant Wilmington oil field in the Los Angeles basin. The company needs an oil price of S21/bbl to justify starting up the wells again.
High lifting costs and low quality crude probably will force other operators in Wilmington field to shut in and plug marginal producers.
In Kern County, Calif., Celeron Oil & Cas Co. is reported to be considering shutting in wells on its Big Hill leases in South Belridge field. Celeron bought the property from Shell California Production Inc. only last year.
The Santa Maria onshore basin area is economically "underwater, especially for independents," says Berg-Hansen. "Postings there have dropped below $6/bbl."
Reports are circulating in California of crude sales to vacuum truck drivers at S5/bbl.
Pickens: Shut-ins needed. It's in their best interests for U.S. oil and gas companies to shut in some production, says Mesa's Pickens.
He believes that the world's 2 million b/d surplus can be absorbed and prices firmed if production cuts in other nations allow Saudi Arabia to regain its lost market share. That attitude underscores Mesa's own decision earlier this month to shut in about 20% of crude output.
"We believe it is in the economic best interest of Mesa's owners tojimit production until prices rise to a level offering more attractive returns to the partnership."
Mesa will limit Its curtailments to properties that can be shut in without reservoir damage and can be returned to full production.
"Although the affected properties are being operated profitably at current prices, Mesa believes the partnership ultimately will realize enhanced returns by deferring this production," Pickens says.
Underlying Mesa's rationale for shutting in economic wells is its belief that.prices will rebound. It contends that the value of its oil reserves would be greater by deferring production than by producing when posted prices barely top lifting costs.
"No producer is forced to continue producing if today's prices are too low to provide sufficient returns," Pickens says. "I am certain that other producers are considering similar reductions to preserve the value of their oil reserves."
Pickens thinks that satisfying the Saudis' wish to regain its lost market share will ease the surplus and stabilize prices.
"The Saudis only want control of 3.5 million b/d; that's a realistic place for them to be. We're ready to give them 20% of our market, if that's what it takes to stabilize the market."
Government actions. Industry officials are calling on the federal and state governments for help during its crisis.
Texaco's McKinley urges the government to clarify its energy policy.
"Today the policy is not dear, and it is not consistent. Washington generally states that its policy is a free market, with competition between different fuels," he says.
"But in practice what we get is a free market when crude prices go down, and a windfall tax when prices rise. Our nation says It is for a free market in oil but continues to control the price of gas. It has a windfall tax on liquid hydrocarbons but none on solid hydrocarbons. It removes the depletion allowance on scarce domestic crude oil and retains the depletion allowance on plentiful domestic coal. It permits imports of crude oil but restricts exports of domestic crude."
Industry should be pushing for continued progress in opening federal lands to exploration and production, decontrol of gas, elimination of the Fuel Use Act, and access to nondiscriminatory gas transportation, says jdhn F. Bookout, Shell Oil Co. president.
"Serious consideration should be given to lowering the industry's tax burden," he says. And he favors continued filling of the Strategic Petroleum Reserve.
"Congress should retain the existing depletion allowance provision. And above all, as the budgetary process evolves in this period of tax reform and deficit reduction, it is important to avoid tax changes that are adverse to the petroleum industry — already one of the most heavily taxed industries."
Import fee needed? Many producers, especially independents, are calling for an immediate tariff imposed on oil imports to buoy the depressed U.S. petroleum industry at least for national security reasons.
"A minicartel of Saudi Arabia, Kuwait, and the United Arab Emirates in the Mideast, where oil is plentiful and costs are low, is conducting an undeclared war to reduce competition. The Hughes report tells us they are winning," says George P. Mitchell, chairman of Mitchell Energy & Development Co.
Mitchell calls for a $10/bbl tariff on crude and product imports, without exception.
With such a fee, he says, the weekly rig count would top 3,500 rigs/ week within 3 years. And by 2000 the U.S. would be 80% self-sufficient in oil.
Without a tariff, U.S. exploration and development activity will collapse. Mitchell has given orders for his company to cancel all drilling except that needed to prevent drainage and loss of leases. If the price war is allowed to continue, he says, U.S. dependence on imported oil will grow to 50% or more by 1990.
The level of the tariff would be pegged to the economics of keeping stripper wells open and inducing operators to search for more oil.
Bookout thinks industry shouldn't yet seek an import tariff, even though it would help.
"There are many reasons to be dubious about how much additional income the industry would be allowed to keep. I see no reason to be optimistic that the major portion of the higher domestic prices achieved by an import fee would flow through to the domestic industry."
Long term threat. American Petroleum Institute says that, as a result of the low level of drilling activity, 'There will be a dramatic decline in domestic production toward the end of this decade, when the worldwide oversupply of oil will have disappeared" (see table).
"This will bring about a sharp increase in oil imports with all the problems that could entail, including higher prices and a much greater degree of vulnerability to politically inspired cutoffs."
Lloyd Unsell, Independent Petroleum Association of America president, estimates the depression has cost Industry 500,000 to 600,000 personnel, many of them experienced.
"If this thing lasts long enough, if (those lost employees) get absorbed
May 19,1906, Oil & Cm Journal 2S *1145 into other industries, it's going to be a costly experience trying to get things regenerated again," he says.
The only hope lies with a production accord among producing nations, Unsell contends.
"I'm not in favor of cartels. I'm arguing for a little economic sanity."
Unsell says Saudi Arabia can manipulate the price of world crude anv-where from $5/bb! to S50/bbl just by setting the chokes on 400 wells at Ghawar field.
"Right now, every independent I know is evaluating their properties lease by lease to determine which should be shut in."
He adds that since many producers can't sell their gas production due to a U.S. oversupply and often can't cover their lifting costs for oil, they have no incentive to develop new reserves.
"Industry cash flow has dropped by two-thirds, and outside investment has disappeared completely, so I don't see any instant solutions."
Benefits accruing to the U.S. economy from the plunge in oil prices may be the biggest factor in government inaction on the plight of the petroleum industry.
"The temporary low price of foreign oil has many government officials claiming credit for improving the American economy/' says L. Frank Pitts, Dallas independent operator.
"But the cheap foreign oil is only the first part of an orchestrated trap, engineered by Saudi Arabia, which soon will set off new oil shocks making those of the 1970s seem to be only tremors by comparison." •
Reserve value writedown rule hits earnings
Oil and gas companies last week took big charges against first quarter earnings, some incurring losses, to comply with Securities and Exchange Commission rules governing write-downs of U.S. reserve values.
Some company officials criticized the SEC stance as unrealistic and harmful to company equity values in the present volatile oil price climate.
Earlier this month, SEC rejected a staff recommendation that it relax rules requiring producers to write down the value of their reserves on a quarterly basis until oil prices stabilize (OG), May 12, p. 38).
Writedowns trim profits. Heavy writedowns of reserve values are widespread and paring company earnings for the first quarter, even though the full effect of the price slump has not been felt.
That can be seen in the level of average first quarter wellhead prices for oil and gas compared with the current level of prices (see table, p. 20).
And further losses from restated earnings are possible as companies using the full cost accounting are obliged by the Securities and Exchange Commission's May 6 decision to conduct a cost ceiling test at the end of each quarter.
Texas Eastern Corp., for example, restated its first quarter earnings as $6 million vs. the $38 million it reported before the SEC decision.
Some companies worry that applying SEC's interpretation with the winter halving of oil prices could result in giving them a negative net worth. That in turn could spur banks to call in loans.
The new guidelines call for companies using the full cost method to limit net capitalized costs of oil and gas properties to the sum of the present value of estimated future net revenues of proved properties and the lower of cost or market value of unproved properties. The SEC staff had agreed with oil companies that reserves values should be calculated at the end of the year, should oil prices rebound.
But the commission contended there is no reason to believe oil prices will improve, nor should it abandon traditional accounting standards, later SEC said it might reconsider the rule.
Pogo: SEC unrealistic. William E. Gipson, Pogo Producing Co. president, blasted the SEC retention of quarterly vs. yearend adjustments as unrealistic in light of the volatile oil price market.
"In addition, the adjustments permanently reduce companies' equity accounts which under present rules can't be restored should oil and gas prices go up again, which we feel will happen," he said.
if the commission reconsiders the rule, "we would hope that the SEC would permit reasonable escalations of prices for oil and gas for the lifetime of the properties," Gipson said.
"This practice is currently followed by oil companies, banks, and reservoir engineering firms. To keep the price at $14-15/bbl, for example, for the entire life of a property is unrealistic in our view."
Pogo's $91.3 million writedown produced a first quarter loss of $46 million for the company, compared with income of $7.9 million in first quarter 1985.
Accounting changes. Companies of varying size last week took first quarter writedowns related to the oil price plunge.
Among the companies and the amounts of writedowns were Pennzoil Co. affiliate Proven Properties Inc. $120 million, UGI Corp. $75.3 million, Kaneb Services Inc. $64.7 million, American Petrofina Inc. $43 million, Pioneer Corp. $42 million, Texas Eastern Corp. $36.7 million, Snyder Oil Partners $33 million, Seagull Energy Corp. $26.6 million, Lear Petroleum Corp. $24 million, Callón Petroleum Co. $23 million, Oxoco Inc. $16 million, Patrick Petroleum Co. $8.1 million, Kencope Energy Cos. $3.45 million, and Petrol Industries $2.2 million.
Subsequent losses were the first quarter result for Kaneb $65 million, American Petrofina $39.7 million. Pioneer $36 million, Snyder $32 million, Lear $27 million, Oxoco $21 million, Callón $24.8 million, Pennzoil $16 million. Seagull $11 million, Patrick $7.9 million, Kencope $2.3 million, and Petrol $1.8 million.
Meanwhile. Houston Industries Inc.'s (HID unit Primary Fuels Inc. retroactively switched its accounting method to successful efforts from full cost in restating its earnings for the 12 months ending Mar. 31.
The change cut Hit's earnings for the fiscal year $94 million to $1.1 billion. Had it retained full cost accounting, Htl would have had to take an $86 million after tax charge for first quarter 1986 alone.
Kaneb also spun off all of its oil and gas assets into Kaneb Energy Partners Ltd., a limited partnership.
Pioneer's writedown related to the sale of its three units involved in heavy construction equipment, oil field equipment, and contract drilling.
A new holding company formed by the Bass brothers of Fort Worth and William G. Flesner, president of International Tool & Supply (ITS), will purchase ITS from Pioneer for about $13 million.
In addition, UGI, Valley Forge, Pa., slashed its petroleum operations and employees by more than half.
UGI this quarter cut its companies to five in three markets from 12 in seven markets at yearend.
It also cut more than 630 employees from its yearend level of 1,130.'
2S Oil & Gas journal, May 19, 1986
*1146 [[Image here]]
*1147 [[Image here]]
*1148 Standard & Poor’s Stock Price Indexes
Description of Method Used in Computation
The S&P 500
The purpose of the S & P 500 Stock Price index is to portray the pattern of common v»ck price movement. Construction of the Index proceeds from industry «roups t<* the whole. Since some industries ere characterized by companies of relatively small stock capitalization, the Index does not comprise the 500 largest companies listed on the New York Stock Exchange. However, the total market value of the S & P 500 as of December 31,19§3, represented 79.4 *7 of the aggregate market value of common stocks traded on the New York Stock exchange.
A major use of the group indexes b as a standard for comparison of the performance of individual atocles within each group. Care is taken to avoid. construction of a group index in which the movements of a single, dominant stock would effectively determine the movements of the group index.
Component stocks are chosen solely with the aim of achieving a distribution by broad industry groupings that approximates the dbtribution of these groupings in the New York Stock Exchange common stock population, taken as the assumed mode! for the composition of the total market. Each stock added to the Index must represent a viable enterprise and must be representative of the industry group to which it b assigned. Its market price movements must in general be responsive to changes In industry alfairs. Aggregate market value of the stock and its trading activity are important considerations in the selection process. Judgments as to tha investment appeal of the stocks do not enter into the selection process.
TheS & Pfti>0 Committee is responsible for all decisions ellt'cting the index. It determines the overall policy and objective* of the Index, imd tMablishei guide* lines and criteria for adding or deleting a company from the Index. The Committee passes on all changes. It is specifically charged with keeping the Index representa* tive and updated, but always within the context of the basic principal of stahiiity.of composition, and every effort is made to avoid excessive turnover of the Index.;
History
The Standard & Poor’s Stock Price Indexes have been steadily expanding their coverage over the years, to supply a dependable measure of the cnmpo*ite price pattern of the majority of slocks. Back in 1923, Standard ¿I Pour's pioneered with the issuance of a scientifically constructed stock price index by leading industrial groups. At that time, 26 sub-group indexes, based on 233 Mock ibsut-⅛, wcr^covered. Currently the coverage is 500 stocks, broken down into 63 individual groups, which comprise the five main groups, i.e. Industrials, Transportation. Utilities, Financial and the 500 Composite. There are also four supplemental umud serit% namely, Capital Goods Companies, CunsumerGoods, High Grade Common Stocks and Low Priced Common Stocks. In addition there arc six group indexes which are not included in the S & P series of 500 stocks. These include sr.d'Nt* of Gnming Cos., Canadian OH & Ga*. Brokerage Firms. Investment Co».. lav-Minert Cos. (Bond* Funds! and Real Estate Investment Trusts.
In July of 1970 the S & P Composite Index of underwent a significant change. Until then, the S&P 500 had three main groups 425 Industrials, 60 Utilities, and 15 Rail*. Under the revised Index, there arc four group*: 400 Industrial*, 40 Utilities, 20 Transportation and 40 Financial.
Standard & Poor’s for many yean had been tracking bank and insurance Blocks bv means of separate indexes, but they had never been included in t lie S & I* 500 for technical reason*. A major problem wa* the dilliclty of ¡nclmling Owr-Tlio-Counter stock* in our computerized calculations.
Many of these bank and Insurance stocks were li*t«d on the New York Stork Exchange in recent years, but some of the most important institutions were not. V\V felt that any group index lacking these bigger institutions would be unacceptable to the investment community.
Recent technology has enabled us to bring ÜTC stocks into the computation process, thus allowing us to enter these important banking and insurance concerns into our Financial group.
We believe the additions we have made to the S & P 500 have given it ne a strength and breadth making it an even more thoroughly representative indicator.
To increase the usefulness of these price indexes, Standard & Poor’» computes companion series of per share data by industry groups, all related to the stock pro e indexes, including per share earnings, dividends, sales, operating income, depreciation, taxes, book value, working capital, and capital expenditures, and significant ratios and yields. These data are published in Standard & Poor’» ANAI.YSTa HANDBOOK annually back to 1952. This publication also includes per shure data presented in income account and balance sheet formats for all induxtriai groups. The ANALYSTS HANDBOOK is kept current through a monthly supplement which, in addition to quarterly sales, earnings and dividends, also contains S & P» official group earnings estimates and indicated dividend rates.
These Standard & Poor's Stock Price Indexes, which are based oo the aggregate market value of the common stocks of all the companies in the sampFe, express the observed market value as a percentage of the average market value during the base period. Originally this period was 1926, and it was subsequently shifted to the average of the 1935-39 period. On March 1, 1957, the current base, 1941-43 equal to 20 was adopted. This new base results in a price index level that is more realistic than that of moot popular composite stock pnce measures in that it Is not absurdly distant from the average price level of all the stocks listed on the New York Stock Exchange. The group indexes added since 1957 are expressed in terms of various recent base periods.
The 1957 revision of the Standard & Poor’s Stock Price Indexes marked a giant step in another direction. Thanks to slectronic computers and input feeders, the four main group indexes art now computed at one minute intervals. S&P does not p&blish these frequent readings, but does maintain a recurd of them. Indexes as ofsteh hour art published in the Daily News Section of S & P’s Corporation Records. Daily high-low and dosing indexes are published in the weekly "Outlook" and the monthly "Current Statistics."
To avoid confusion, Standard & Poor's has standardized on its former daily price index (50 Industrial, 20 Rails, 20 Utilities, 90 Composite) for the back record. Henceforth, the monthly, weekly, daily and hourly indexes will be identical and interchangeable. Since March 1,1957, the daily composite index has been based on 500 stocks.
Stock Price Index Formula
* The formula adopted by Standard & Poor's after much testing, is generally defined as a "base-weighted aggregative" expressed in relative* with the average value for the base period (1941-1943) equal to 10. This method of computation has two distinct advantages over most index number series: (1) u ha* tíiv necessary flexibility to adjust for arbitrary priu> changes caused by the itwmmru of rights, stock dividends, splitups, ote., «mi (2) thu rcnultur.t index tmitihcr» arc* accuratu and have a relatively high diyirc oí continuity v/bii!. ■ *1149 especially important when long term comparisons are to be made. Certain moderations to the basic formula have been necessary to maintain the best possible representation over the years. The character of the stock market is subject to gradual, but continuous shifting, and it is only hy periodic checks of coverage that true representation can be maintained.
WEIGHTING — Each component stock is weighted so that it will influence the index in proportion to its respective market importance. The most suitable weighting factor for this purpose is the number of shares outstanding. The price of any stock multiplied by number of shares outstanding gives the current market value for that particular issue. This market value determines the relative importance of the security.
BASE VALUES AND GROUP INDEXES — Market values for individual stocks are added together to obtain their particular group market value. These group values are expressed as a relative, or index number, to the base period (1941-1943) market value. As the base period market value is relatively constant, subject to change only as described in this text, the index number reflects only fluctuations in current market values.
BASE PERIOD — The base value for any group ¡9 the average of the weekly group values for the period 1941-1943. The current group vaiue is expressed os a relative by dividing it by its base period value and multiplying the resulting quotient by 10. In this relative form an index number attains its maximum usefulness for statistical purposes.
•FORMULA — The formula for the base-weighted aggregative index Í9
[[Image here]]
where Pi, represents the current market price. Po the market price in the base period, (Ji the number of shares currently outstanding, and Qo the number of shares outstanding in the base period, subject to adjustment when necessary to offset changes in capitalisation. X is the Greek letter Sigma, which always indicates addition, or the sum of. and in this instance indicates the addition of ail the market values of the individual companies comprising the group.
Variations in the Formula
STOCK DIVIDENDS AND SPLIT-UPS — It is possible to rnake absolute correction for a stock dividend or stock spiit-up: simply change the weighting factor to equal the number of stock shares outstanding after the dividend or split-up has become effective. This new weighting factor is introduced when computing the first index after the stock sells ex-dividend, or the new stock is traded.
STOCK RIGHTS — Many corporations, at the time of selling additional common stock, is*ue rights for its purchase to their -tuckholdcrs. Two methods have been used nt different times to offset the <.&<■: «-.‘the arbitrary price change caused by these rights.
During the 1918-1925 period the procedure was to increase the weighting factor just enough to offset the decline in the value of the issue caused by the decrease in price when the stock sells ex-nghia. This method did not require any change in the base period values.
From the beginning of 1926 an improved :u« th.-d for adjusting for stock rights has been used. Now the weighting factor (shon-s outstanding) is increased hy the number of shares actuolly sold, the market value reflecting this increase in capitalization based on the market price of the ¿ha:*' on the day they ore traded on an ex-rights hnsis. An offsetting, or prop . i«n.»tf\ adjustment is then made to the base period value. (See footnote on mctV •: ••> u..iking bose changes).
CONSOLIDATION AND ACCJUIFITI* - Wis.-ri* a corporation absorb* another, wholly or in part through the «-«•imim* • tVomimn slock, or when a consolidation involves one or more corpouur.n, >h.i« are not already a part of the index, tho weighting factor has to be chars' *•> a.;n*e with the share-* of stock outstanding and n new bns>> value must be «!•" r.:-uu;<l. The computation here is the same as that described in the footnot- tn m\ Here the adjustment is bnsed on the vaiue of additional shares mit*tim valued at the current market
SPIN-OFFS — Spin-offs to common stockholders of subsidiary companies pro dure an arbitrary downward price change at the time the etock sells ex-dividend This situation has no effect upon the weighting factor for 'he stuck involved. I: does, however, necessitate a new base value for the group tha.t will be smaller thar the old base value. The method of adjusting the liase i* as> described in the footnot* •below. This adjustment always reduce» the base period value, the adjustment bein¡. dependent on the decline in price due to the spin-otf.
ADDING OR DROPPING STOCKS — The addition of new stocks to any group involves only an increase in the old base value. (See footnot ei. The reverse opera tion is employed when stocks are dropped from the group.
SUBSTITUTIONS — Substitutions are kept to an absolute minimum However, to maintain current representation, and because of mergers, delist-ings, etc., substitutions ore unavoidable. The adjustment to offset the difference between the two stocks involved is basically the same as for adding or dropping stocks, but based on the difference in market vaiue between the two.
* Weighting factors are revised to include small stock issues, such as those f..r minor absorptions, stock sold to employees, etc., as the multiplying factors an checked with the latest corporation report. An increase in stock outstanding involves an increase in the weighting factor for that stock, the stock added to the group is evaluated at current prices, and a new base value is computed < os shown in footnote) that offsets the value thus added.
Dates of Indexes
The weekly data contained in this book are based on Wednesday's closing prices, or the last preceding sale price, this mtd-w«ek observation being considered most representative. The monthly averages are based on the indexe> of the four or five weekly indexes of the month. Prior to 1954. the years closing price indéx was the last Wednesday of the year; beginning 1954 it is us ol the iast trading day of the year.
Distribution of Indexes
Standard & Poor's Indexes for the main group* appear hourly on the ticker* <>: * the American Stock Exchange, the Commodity News Service, the Cotton Exchar, Ticker, the Pacific Coast Stock Exchange, and the Montreal Stock Excn»nge. Al« Bunker Ram», Quotron, and ADP/F.I.S. (all electronic quotation services* cam the S & P 500 on a minute by minute basis, as well as the sub-indexes on an hourly basis. The Associated Pre»s, United Press-International and Reuters 'world-wide send the closing indexes over their financial news w ires every day for publication hy member popera. In addition, many of the national weekly news magazines repur1 the indexes regularly.
The weekly indexes, hy industrial groups, are published m the S & P weekly “Standard & Poor's Indexes of the Security Markets", and in the monthly “Curren* Statistics."
BASE CHANGES — Base change* arc, in effect, proportional adjustment* m ¡te value i>< offset arbitrary changes in the mork«t values upon which the index i« bn«ed. The procedure if always as illustratad below.
OLD BASE VALUE NEW MARKET VALUE tNewBostsi OLD MARKET VALUE .OÍdBas’tsi NEW BASE VALUE
or. assume a change which increases the market value hy 12 0 million Hollars, und that our aggregate market value after thu increase is 1590.0 milliondmW*. und u 'm*e period value of 302 9 Then the new base period is
[[Image here]]
it will be noted that the difference between the numerator ur.d denominator in the abo>e equation is 12.9, the amount for which the adjustment is being nude
Adjustments are always made in this manner. Reduction* in K<«» period vului-s sometimes occur if a *tock is withdrawn or the substitution of a sntollvr company i* nmde. In such case» the numerator is, ofcounc, smaller than the denominator.
*1150 [[Image here]]
*1151 [[Image here]]
*1152 [[Image here]]
*1153 [[Image here]]
*1154 [[Image here]]
*1155 [[Image here]]
*1156 [[Image here]]
*1157 [[Image here]]
*1158 [[Image here]]
*1159 [[Image here]]
*1160 [[Image here]]
*1161 [[Image here]]
*1162 LISTING OF COMMUNITY ASSETS AND LIABILITIES
ASSETS
CASH.$ 50,152.80
NOTES RECEIVABLE.$ 3,925.00
ACCOUNTS RECEIVABLE.$ 21,200.00
LISTED STOCKS.$ 54,266.63
UNLISTED STOCKS.$ 44,507.26
243 ACRES OF WETLAND.$ 13,250.00
MINERAL ROYALTY.$ 209.97
DIFFERENCE IN MERCEDES VALUES.$ 3,000.00
PIASANO INVESTMENTS.$ 22,970.38
1979 CADILLAC.$ 5,325.00
1977 FORD TRUCK.$ 175.00
BOAT AND TRAILER.$ 26,753.36
UTILITY DEPOSIT. $ 375.00
DÚE FOR IMPROVMENTS TO LUKE'S PROPERTY.$ 400,423.09
DUE FOR PURCHASE OF FLORIDA PROPERTY.$ 156,631.40
$ 803,164.89
LIABILITIES
WHITNEY NATIONAL BANK. .$ 300,000.00
ACCRUED INTEREST. .$ 61.356.31
ACCOUNTS PAYABLE FOR FUEL AND SUPPLIES. .$ 225,000.00
ACCRUED INTEREST. .$ 23.568.32
DUE LUKE FOR PAYMENT OF COMMUNITY DEBTS. $ 611,553.00
$1,221,477.63
*1163 NET COMMUNITY.$-418,312.74
ONE-HALF SHARE.$-209,156.37
[[Image here]]